J-S28029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH ROBERT DANIELS II | : | |
| | : | |
| Appellant | : | No. 270 WDA 2023 |

Appeal from the Judgment of Sentence Entered October 14, 2022
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0003893-2019

BEFORE: PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED: SEPTEMBER 19, 2023**

Appellant, Kenneth Robert Daniels II, appeals from the judgment of sentence entered October 14, 2022, as made final by the denial of his post-sentence motion on February 13, 2023. We affirm.

In July 2019, the Commonwealth charged Appellant with various offenses relating to the sexual abuse of his two minor daughters, C.J.D. and A.J.D. Appellant proceeded to a jury trial, which culminated on July 20, 2022. That day, the jury found Appellant guilty of rape by forcible compulsion; involuntary deviate sexual intercourse - threat of forcible compulsion; aggravated indecent assault - threat of forcible compulsion; aggravated indecent assault – complainant less than 16-years-old; incest of minor – complainant 13-18; indecent assault - complainant less than 13-years-old;

_____

[*] Former Justice specially assigned to the Superior Court.

indecent assault – complainant less than 16-years-old; indecent assault – forcible compulsion; and two counts of corruption of minors.[1]  Thereafter, the trial court deferred sentencing to facilitate the preparation of a presentence investigation report and to allow the Pennsylvania Sexual Offenders Assessment Board to determine whether Appellant met the criteria of a Sexually Violent Predator ("SVP").  On October 14, 2022, the trial court conducted a joint SVP and sentencing hearing.  Ultimately, the trial court determined that, while Appellant did not meet the SVP criteria, he was subject to designation as a Tier III offender under the Sexual Offender's Registration and Notification Act ("SORNA").[2]  The trial court also sentenced Appellant to an aggregate term of 22 to 50 years' imprisonment, followed by three years' probation.  Appellant filed a post-sentence motion on October 21, 2022, which the trial court denied on February 13, 2023.  This timely appeal followed.

Appellant raises the following issue on appeal:

> Whether the trial court erred in determining that [] Appellant's conviction was supported by the weight of the evidence when the testimonial evidence of both alleged victims was biased, disparate, inconsistent, contradictory and unsupported by any physical evidence to such a degree that [] Appellant's conviction should be shocking to the conscience of the court?

Appellant's Brief at 2 (superfluous capitalization omitted).

_____

[1] 18 Pa.C.S.A. §§ 3121(a)(2); 3123(a)(2); 3125(a)(3); 3125(a)(8); 4302(b)(2); 3126(a)(7); 3126(a)(8); 3126(a)(3); and 6301(a)(1)(ii), respectively.

[2] 42 Pa.C.S.A. §§ 9799.10 to 9799.41.

Appellant's claim challenges the weight of the evidence. Our standard of review is well-settled:

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the [] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for

- 3 -

the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Commonwealth v. Soto***, 202 A.3d 80, 97 (Pa. Super. 2018) (citation and some quotations omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable J. Scott O. Mears. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Mears's February 13, 2023 opinion. Therefore, we affirm on the basis of Judge Mears' thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Mears' February 13, 2023 opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/19/2023

- 4 -

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) |
| VS. | )   No. 3893 C 2019 |
| | ) |
| KENNETH DANIELS, | ) |
| Defendant | ) |

## OPINION AND ORDER DENYING POST-SENTENCE MOTIONS

AND NOW, to wit, this 13th day of February, 2023, after review and consideration of the Defendant's Post-Sentence Motions filed on October 21, 2022; the Defendant's Brief in Support of Post-Sentence Motions filed on December 19, 2022; and the Commonwealth's Brief in Opposition to the Defendant's Post-Sentence Motions filed on January 19, 2023; the Court provides the following Opinion and Order of Court:

I. PROCEDURAL HISTORY:

After a three (3)–day jury trial, which concluded on July 20, 2022, the Defendant was found guilty of ten (10) sexual offenses against his two minor daughters, C.J.D. (DOB 4/3/01) and A.J.D. (DOB 6/7/05). Against C.J.D, the Defendant was found guilty of: one (1) count of Rape, 18 Pa.C.S.A. §3121(a)(2), a first degree felony; one count of IDSI, 18 Pa.C.S.A. §3123(a)(2), a first degree felony; two counts of Aggravated Indecent Assault, 18 Pa.C.S.A. §3125(a)(3) and (8), second degree felonies; one count of Incest, 18 Pa.C.S.A. §4302, a second degree felony; one count of Corruption of Minors, 18 Pa.C.S.A. §6301(a)(1)(ii), a third degree felony; and two counts of Indecent Assault 18 Pa.C.S.A. §3126(a)(3) and (8), second degree misdemeanors. Against A.J.D., the Defendant was found guilty of one count of Indecent Assault, 18 Pa.C.S.A. §3126(a)(7), a third degree

1

Circulated 08/31/2023 10:03 AM

felony, and one count of Corruption of Minors, 18 Pa.C.S.A. §6301(a)(1)(ii), a third degree felony. The Defendant's sentencing was deferred pending a SORNA assessment and a pre-sentence investigation. (Ord. of Ct., Jul. 26, 2022, J. Mears.) On October 14, 2022, the Court found the Defendant to be a Tier III non-violent sexual predator, with a lifetime registration requirement under SORNA, and sentenced him to an aggregate sentence of twenty-two (22) to fifty (50) years of incarceration and three (3) years consecutive probation. (Ord. of Ct., Oct. 14, 2022, J. Mears.)

On October 21, 2022, the Defendant filed timely Post-Sentence Motions, challenging the weight of the evidence upon which the jury convicted him. He contends that C.J.D.'s and A.J.D.'s trial testimony was "disparate, inconsistent, and contradictory" with their statements to the forensic interviewer, the state police, and during the preliminary hearing; and was "unsupported by any physical evidence to such a degree that the convictions should shock the conscience of the Court." (Def's Brief in Sup. Of Post-Sent. Mot., Oct. 21, 2022, 6.)

II.    FACTUAL HISTORY:

During the jury trial, the Commonwealth presented the testimony of five (5) witnesses: C.J.D. and A.J.D., the Defendant's daughters and victims; Rhonda Daniels, the Defendant's ex-wife and mother of C.J.D., A.J.D. and Kenneth III; Carol Hughes, an expert in the field of victim and offender behaviors in the context of sexual abuse; and Pennsylvania State Trooper David Wineland. The Defendant presented the Defendant's son, Kenneth Daniels III and character witnesses, Ray Thomas and Sally Swan.

2

The Commonwealth's first witness was the Defendant's daughter C.J.D. She has few memories of living with her parents in an intact family, as they divorced when she was young. After the separation, C.J.D. lived primarily with her mother and visited her father every other weekend. In fourth grade, she moved in with the Defendant, who lived with his girlfriend Heather; their children Eli, Serenity and Ivy;[1] and Heather's oldest daughter Shay. She attended Mount Pleasant brick-and-mortar school until the beginning of eighth grade, when the Defendant enrolled her in cyber school. C.J.D. testified that she neither requested nor agreed to the change. After transferring to cyber school, C.J.D. noticed a change in her relationship with her father. She described it as "a little off." (T.T., Jul. 19, 2022, 31:9-10.) It was then that he started sexually abusing her.

C.J.D. testified that the abuse began with her father texting her, *via* his cellphone "Notes" App, that she was now old enough to see what male genitals looked like. (Id. at 14-19.) She responded that she was too young and not interested. (Id. at 31:17-18.) (C.J.D. admitted on cross-examination that this was first time she ever mentioned the conversation on her father's "Notes" App.)(Id. at 60:17-25, 61:1-6.) Later that night, around 10:30 p.m., as she laid on her bed, trying to fall asleep, C.J.D. heard her father coming up the stairs. (Id. at 31:20-25.) He entered her room, sat down on her bed, and said that he had to talk to her. (Id. at 32:3-5.) He mentioned their earlier conversation. She told him again that she didn't want to know because she was too young. (Id. at 32:11-13.) She then rolled onto her stomach to go to sleep. Her father touched her

---

[1] C.J.D. wasn't certain if Serenity and Ivy had been born before or after she moved in with her father. (Id. at 29:25, 30:1.)

3

breasts and genitals under her clothing. He pulled her shorts down, and tried to enter her vagina with his penis. (Id. at 32:16-17.) (On cross-examination, she admitted that she testified at the Preliminary Hearing that her father pulled her shorts *to the side*. (Id. at 71:21-22.) When asked which statement was correct, C.J.D. said that he pulled her shorts to the side, not off, as she had testified to on direct examination. (Id. at 72:15.)) C.J.D. described how she had tried to fight him off, but acknowledged that he was too big. Ten (10) to fifteen (15) minutes later, he left her room without saying anything. (Id. at 32:19-22.)

What happened that night was not an isolated incident, but the beginning of a pattern of sexual abuse that continued for two more years. C.J.D. estimated that her dad assaulted her sixty (60) or more times between eighth and tenth grade. (Id. at 36:6-8.) (At the preliminary hearing, she testified that her father had assaulted her thirty (30) to forty (40) times. (Id. at 66:20-23.)) C.J.D. testified that she wasn't always alone in the house with her father when he assaulted her. She recalled some of the assaults occurring while Heather was asleep and her siblings were playing in other parts of the house. (Id. at 36:13-17.) (On cross-examination, she admitted that she had told the forensic interviewer that all of the assaults had occurred when no one else was home. (Id. at 75:12-15.) C.J.D.'s statement to the Pennsylvania State Police and her preliminary hearing testimony are consistent with her trial testimony. (Id. at 63:9, 21-25, 64:9.))

C.J.D. described what looked like a "white, gooey, gross" mucus come out of her father's penis. (Id. at 36:23-24.) "He would either put the cum all over my bed or on me." (Id. at 37:1-2.) She said that he would touch her breasts and genitals with his

4

tongue, and that she would perform oral sex on him. (Id. at 37:10-12, 18-19.) She estimated that she performed oral sex on her father five (5) to six (6) times and that he performed oral sex on her ten (10) times. (Id. at 38:1-6.) (On cross-examination, C.J.D. acknowledged that she hadn't mentioned oral sex to the forensic interviewer, and that during the preliminary hearing she testified that she had only performed oral sex on her father twice. (Id. at 79:5-16.))

After the abuse started, the Defendant stopped C.J.D.'s visits with her mom. (Id. at 38:7-9.) When asked why she never told anyone about the abuse, C.J.D. responded that "he (her father) pretty much made it to where no one would believe me and he would make my life miserable if I did tell." (Id. at 39:5-7.)

In October of 2017, the Defendant told C.J.D. that he was "done with [her]," and that she should pack her stuff because she was leaving. (Id. at 39:17-20.) He then drove her to her mother's house and dropped her off. (Id. at 40:1-2.) Shortly after moving in with her mom, C.J.D. disclosed the abuse to her boyfriend Shane. (Id. at 42:1-2.) He told her to tell her mom. (Id.) When she did, her mother asked her what she wanted to do. C.J.D. said that she wanted to go after him to prevent it from happening to her other sisters. (Id. at 42;15-16.) However, C.J.D. learned shortly thereafter that her father had already started sexually abusing A.J.D.

C.J.D. testified that A.J.D. disclosed the abuse to her as she and Shane were driving her home from a holiday party, sometime around Thanksgiving or Christmas 2017. A.J.D. told her that she had received a text message from their dad on his "Notes" App, telling her that it was time that she saw a man's genitalia. (Id. at 45:3-4.)

C.J.D. told her sister that she was "done," and that she wasn't going back to their father's house. (Id. 45:5-6.) She, then, told her mom what A.J.D. had said. Emotionally, C.J.D. was struggling. She felt depressed and numb. (Id. at 48:11.) She had trouble sleeping, and often "starved" herself because of negative body image. (Id. at 42:21-22.) C.J.D attended counseling at the Blackburn Center a few times, but C.J.D. stopped because she wasn't ready to talk about it. (Id. at 43:6-7.) After failing tenth grade twice, C.J.D. left school and took the GED.

C.J.D. acknowledged inconsistencies in the stories she told the police, the forensic interviewer, and at the preliminary hearing. She explained that:

> ...I know I was there (at the forensic interview) to tell them everything, but there was a lot of things that even though I knew I should have said, I was too embarrassed to say.

(Id. at 99:22-25, 100:1-2.)

A.J.D. was the next to testify. She testified that she has no recollection of living with both of her parents in an intact family. Like C.J.D., she initially lived primarily with her mother; her biological siblings Heavenly, Kenny and C.J.D.; and her half-brothers Logan and Jameson; and visited her father; his girlfriend Heather; Heather's daughter Shay; and her three half-siblings Ivy, Serenity and Eli every other weekend. (Id. at 112:15-18.) A.J.D.'s first recollection of sexual abuse by her father occurred two months after her ninth (9th) birthday. (Id. at 114:11-20.) She was in the living room with her father. Heather and the children were asleep, upstairs in their bedrooms. Her father handed her his phone with a typed conversation visible in the "Notes" App. She read what he had typed. He asked her to touch his private part. (Id. at 115:1-10.) A.J.D. said

6

that she refused. The Defendant then grabbed her breasts and rubbed them. (Id. at 115;18-20.) He touched her vagina and rubbed his finger up and down inside the folds of the skin of her clitoris. (Id. at 116:17-18.) She testified that this type of touching continued over the next few years. (Id. at 117: 6-8.)

Despite her father's continued inappropriate touching, A.J.D. moved in with him when she was in the fifth (5th) grade. She explained that she did so to be closer to C.J.D., who she hadn't seen in a while because the Defendant wouldn't allow her to visit their mom. (Id. at 117:14-17.) The Defendant encouraged A.J.D. to enroll in cyber school. She believes it was because he didn't want her to tell people about the abuse. (Id. at 118:11-14.) She only stayed at her father's house for five (5) or six (6) months, before moving back in with her mom. A.J.D. testified that she never told anyone that her dad inappropriately touched her because she was scared that no one would believe her because he was her dad, and "most people don't want to believe that." (Id. at 119:22-24.)

When A.J.D. was in 7th or 8th grade, C.J.D. moved back in with their mom. She recalled C.J.D. and her boyfriend Shane driving her home from a party on New Year's Day 2017, and asking her if there was something wrong. She eventually admitted that she was being inappropriately touched by the Defendant. (Id. at 121:15-16.) C.J.D. told her mom. A.J.D. said that she couldn't tell her herself because she didn't think her mom would believe her. (Id. at 122:13-14.)

Several months later, A.J.D. participated in a forensic interview. She told the interviewer that her father wanted her to "suck his dick," but that she had refused. (Id.

7

at 124:1-2.) She said that she had tried to physically resist her dad when he touched her, but she wasn't strong enough, and "he would try to find ways to hold – to not make me move and stuff." (Id at 124:15-17.)

On cross examination, A.J.D. was asked what she believed would happen when she moved in with her father. A.J.D. said that she thought her dad would stop sexually abusing her. (Id. at 130:23.) Because of the Defendant's bad knees, Attorney Noga questioned A.J.D.'s testimony that her father had touched her while she was sitting on the bed and he was kneeling on the floor. While acknowledging her father's medical condition, A.J.D. remained adamant that her story was true. (Id. at 132:19-25.) She did, however, change her testimony about the day she told her sister and Shane about the abuse. A.J.D. had originally testified that it occurred on New Year's Day, but, when presented with the preliminary hearing transcript, she changed the date to sometime closer to Thanksgiving (Id. at 135:8-11.) A.J.D. explained her inconsistency by admitting that her "twelve (12)-year-old brain didn't really comprehend months." (Id. at 137:17-19.)

The Commonwealth's next witness was Rhonda Daniels. Daniels testified that she and the Defendant agreed to a custody arrangement based upon their children's preferences:

> We let them decide on where they wanted to live. Some decided with me. Some stayed with him, and then whenever they wanted to come visit, they obviously was (sic.) allowed to come visit.

(Id. at 142:19-22.) She said that C.J.D. lived with her initially; but, moved in with the Defendant when she was eleven (11). (Id. at 142:25.) C.J.D. called and visited her often;

8

however, that stopped when she turned thirteen (13), maybe fourteen (14). (Id. at 144:2-7.) Whenever Daniels would ask to see C.J.D, the Defendant would tell her that she was staying overnight at a friend's house or that she had other plans and wasn't available for a visit. (Id. at 144:5-10.)

Daniels testified that A.J.D. also decided to live with her initially after the divorce. However, when she was in fifth grade, she asked to move in with the Defendant. (Id. at 144:12-18.) He immediately removed her from brick-and-mortar school, and enrolled her in cyber school. A decision Daniel's claims was made without her consent or knowledge. (Id. at 143:18-19.) "I would have been against it." (Id. at 143:21.) A.J.D. stayed at her father's house for only five (5) months. After moving back in with her mother, she finished her year in cyber school, and then reenrolled in Jeannette's brick-and-mortar school. (Id. at 145:8.)

Daniels testified that around Thanksgiving 2017, approximately one month after C.J.D. moved in with her, C.J.D. disclosed to her that she had been raped by her father. (Id. at 146:18-19.) A few months later, C.J.D. told her that the Defendant had also inappropriately touched A.J.D. (Id. 153:21-23.) She took both girls to the Blackburn Center for counseling. (Id. at 147:20-22.) Daniels couldn't recall if she or the Blackburn Center notified the Jeannette Police. (Id. at 148: 15-17.) Regardless, the police became involved and a forensic interview was scheduled. Daniel's denied telling the girls what they should or should not say at the interview. (Id. at 148:15-17.) According to Daniels, C.J.D. never visited her father again; A.J.D., however, went occasionally, but not as often as she used to. (Id. at 149:13-14, 25.)

9

Psychologist Carol Hughes was the next witness to testify on behalf of the Commonwealth. With no objection from the defense, the Court permitted Hughes to be qualified as an expert in the field of victim and offender behavior in the context of sexual abuse. (Id. at 161:20-25.) Based upon her experience with and treatment of young children, teenagers, and adults, who have experienced sexual abuse, Hughes explained that it is typical for victims of sexual abuse to delay disclosure. (Id. at 163:8-13.) The delay could be days, weeks, or even years. (Id. at 164:23-25.) She identified the many factors that affect a victim's disclosure, including the relationship of the abuser to the victim and his behaviors to coerce secrecy:

> Most often the abuse is perpetrated within the family system... So that typically means that this is someone who has emotional significance to the child and to other family members. They play a significant role in the child's life and the lives of other family members, especially if it's a caretaker for the child. So we have the child who's in a subordinate position. They're dependent on the adult, again, especially if it's a caretaker. They don't have equal power in that relationship. It's also the case that the abuse is not happening all of the time. The abuse is mixed with, I'm going to call it, the other good behavior. So someone who's engaging in offense behavior doesn't have their offender hat on all of the time... So the child also has experience with this individual of all the really good behaviors that you look for in a caregiver or that you're looking for in someone that is trusted within a family system... We also have to look at did the offender engage in any behavior to coerce secrecy. It might be as simple as don't tell anyone, to don't tell anyone or your mom will be mad, and that will break up the relationship. Don't tell anybody, or you'll get in trouble, and you'll be taken away from us, or as long as you don't tell, I won't do this to your sisters...Children will tolerate a whole lot to preserve their family situation even when something so called bad is going on within the family situation.

(Id. at 165:13-25, 166: 1-25, 167: 1-19.) Hughes further explained how other internal factors, such as shame and fear of judgment, affect how a child discloses sexual abuse:

10

> The shame that the child feels in making that disclosure, and if they make the disclosure, chances are pretty good then they have to start talking to a lot of people, whether its caseworkers, police officers, detectives, the forensic evaluator, the psychologist that you're now seeing for treatment, attorneys, the Court. And for some individuals each telling is like reliving that experience, and so it's putting them back in touch with the emotions of that experience, the visual images of that experience. Fear of judgment. They fear they will be... viewed as damaged goods. If they can't anticipate consequences of the disclosure, having to sort through, do I think I'm going to be supported in my disclosure, or is there going to be a negative reaction that my family members aren't going to believe me...

(Id. at 167:20-25, 1681-14.) The defense asked Hughes on cross-examination if it was typical for a victim of sexual abuse to escape, when presented with an opportunity to do so. Hughes responded that it was not, especially if the victim is a child.

> It is a very complicated situation. No child is prepared to be sexually abused by an adult, especially the adult who's in that caregiver role or who was a parent, and when it's the parent who's harming the child, I mean, this is a parent who is supposed to look out for you, who is supposed to take care of you, who's supposed to keep you safe, and now they're the person who's creating the harm. That really leaves the child in a dilemma. So, when we talk about this idea of escape, who are they supposed to go to? Because you can't go to the parent who's now harming you. And again, do you take the risk of going to the other parent? ... do I tell on my dad, especially if I know that this might mean Dad goes to jail? Many years ago, I had a little one who said to me, I don't want to lose my dad; can't you tell him just to stop it? And that's the thinking. That's the reasoning of a child who loves their dad, but they want the bad stuff to stop.

(Id. at 189:19-25, 190:1-13.)

Trooper David Wineland, of the Pennsylvania State Police, testified that he was assigned this case on April 24, 2018, after a Childline report was made by a Blackburn Center caseworker. The case was initially referred to the Jeannette Police Department, but was later transferred to Mount Pleasant, which is under the jurisdiction of the

11

Pennsylvania State Police. As the trooper assigned to the case, Wineland was provided with copies of the girls' April 20, 2018 forensic interviews. Copies of the videotaped forensic interview of A.J.D. (Commonwealth's Exhibit 1) and C.J.D. (Commonwealth Exhibit 2) were introduced into evidence by the Commonwealth, with no objection from the defense. Trooper Wineland testified that he first interviewed C.J.D. on March 20, 2018. He interviewed her again on July 24, 2019, along with A.J.D. and Kenneth Daniels III.

Kenneth Daniels III testified on behalf of the defense. He said that he lived with his father for eight (8) months during fifth grade. At that time, his father's girlfriend Heather, Shay, Eli, and C.J.D. lived in the household with him. He moved back in with his mother after a falling out with his father. During the eight (8) months that he lived with his father, Daniels thought C.J.D.'s relationship with the Defendant was "good." (Id. at 33:9.) C.J.D.'s relationship with Heather, on the other hand, was good at first, but later, deteriorated- "They couldn't be in a room with each other without... it feeling really tense in there." (Id. at 33:15-24.) Daniels said that he went to his father's house after Christmas Day 2017 and A.J.D. was there. He recalls A.J.D. throwing a massive fit because she didn't get the camera that she wanted, and he heard her say that she was going to ruin the Defendant's life or find a way not to come back. (Id. at 35:9-12.) A.J.D. could not recall this incident. In fact, she specifically denied spending Christmas 2017 at her father's house because "her mom wouldn't let [her]." (Trial Tr., Jul. 19, 2022, 135:22-24.) However, she did admit that if she had expressed disappointment at not getting a camera, she "probably [did] thr[o]w a fit." (Id. at 136: 1-21.) Kenneth was

12

asked if he had ever heard C.J.D., her boyfriend Shane, and A.J.D discussing their father

and the sexual abuse allegations. He said that he had, but he couldn't recall the specifics

of the conversation. (Trial Tr., Jul, 20, 2022, 35: 23-25.)

### III.    DISCUSSION:

Our Supreme Court has stated that a trial court must first review a weight

challenge using the following test:

> A motion for a new trial based on a claim that the verdict is against the
> weight of the evidence is addressed to the discretion of the trial court.
> Commonwealth v. Widmer, 744 A.2d 745, 751-52 (Pa. 2000);
> Commonwealth v. Brown, 648 A.2d 1177, 1189 (Pa. 1994). A new trial
> should not be granted because of a mere conflict in the testimony or
> because the Judge on the same facts would have arrived at a different
> conclusion. Widmer, 744 A.2d @752. Rather, "the role of the trial judge is
> to determine that 'notwithstanding all the facts, certain facts are so
> clearly of greater weight that to ignore them or to give them equal
> weight with all the facts is to deny justice." Id. at 752.

Commonwealth v. Clay, 64 A.3d 1049, 1054-55 (Pa. 2013). "An abuse of discretion will

not be found based on a mere error of judgment, but rather occurs where the court has

reached a conclusion that overrides or misapplies the law, or where the judgment

exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-

will." Commonwealth v. Harrington, 262 A.3d 639, 644 (Pa.Super. 2021)(quoting

Commonwealth v. Woodard, 129 A.3d 480, 494 (Pa. 2015). "The weight of the evidence

is exclusively for the finder of fact, who is free to believe all, none, or some of the

evidence and to determine the credibility of witnesses." Commonwealth v. Talbert, 129

A.3d 536, 545 (Pa.Super.2015). "Resolving contradictory testimony and questions of

credibility are matters for the finder of fact. Commonwealth v. Hopkins, 747 A.2d 910,

917 (Pa.Super. 2000). "If the fact finder returns a guilty verdict, and if a criminal

13

defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice." Commonwealth v. West, 937 A.2d 516, 521 (Pa.Super. 2017).

The Defendant contends that the testimonial disparities are so glaring and obvious that this Court should be shocked by the jury's verdict. (Def's Br. In Sup. Of Post-Sen Mot., Dec. 19, 2022, 6.) As the defense pointed out on cross-examination, there are inconsistencies in C.J.D.'s statements. She acknowledged them. However, that doesn't mean that she is lying about the sexual abuse. Carol Hughes explained that sexual abuse victims often delay full disclosure, and that statements made in the beginning of an investigation don't always include all of the details that are provided later on. Hughes called this type of delayed disclosure "Tiered Disclosure." (T.T., Jul.19, 2022, 163:12.) Tiered Disclosure explains why C.J.D.'s statements to the forensic interviewer and Trooper Wineland did not include details of oral sex and abuse throughout the home. The shame and embarrassment of telling so many people throughout the investigation explains why C.J.D. was not fully forthcoming in the beginning. C.J.D. admitted that she was embarrassed and as a result didn't disclose everything to the forensic interviewer. The jury accepted this explanation and disregarded the discrepancies. It was within the purview of the jury, as fact finder, to do so. Therefore, their decision to find C.J.D. to be a credible witness does not shock the conscience of the Court.

14

A.J.D.'s inconsistent statement regarding the time of her disclosure to C.J.D. and Shane does not rise to the degree that would render her testimony incredible as a matter of law. She explained that at the age of twelve, she wasn't good at remembering the month that certain incidents occurred. C.J.D. and Rhonda Daniels were also uncertain as to whether the disclosure occurred around Thanksgiving, Christmas or New Years' Day. However, they corroborated A.J.D.'s description of the type of sexual abuse she endured at the hands of her father. The jury disregarded A.J.D.'s inconsistent recollection of the date of her disclosure and found her to be a credible witness. This determination does not shock the conscience of the Court.

The Defendant also contends that C.J.D.'s and A.J.D.'s "plot to destroy their father" was proven through the "credible" testimony of Kenneth Daniels, who overheard their conversation to frame their father for sex offenses he didn't commit. (T.T., Jul.20, 2022, 35:18-22.) However, Daniels couldn't recall the specifics of the conversation he claims to have overheard. Clearly, the jury gave no weight to Daniel's testimony- a decision they are permitted to make. The Defendant argued that the girls' motives to discredit and destroy their father were clear- C.J.D.'s motive was to gain independence from her father and because of her distaste for Heather; A.J.D.'s motive was to hurt her father for not giving her the Christmas presents she wanted. Obviously, the jury didn't agree. They may have believed that C.J.D. wanted her independence and disliked Heather, and that A.J.D. was upset when she didn't get the camera; but they didn't believe it proved that the girls conspired to falsely accuse their dad of sexual abuse. Evidence of their disagreements with their father doesn't prove that C.J.D. and

15

A.J.D. conspired to destroy their father. To make that segue, the jury needed more. The Court agrees. After consideration of all of the evidence, the Court finds that the jury's determination that the girls were being sexually abused by the Defendant is not against the weight of the evidence. The Defendant has not offered any substantial reason why the jury's credibility determinations ought to shock the conscience of the Court. Therefore, his challenge to the weight of the evidence fails.

## IV. CONCLUSION:

For the reasons set forth above, the Defendant's Post-Sentence Motions are DENIED.